Filed 8/13/25  P. v. Mejia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA MICHAEL MEJIA,<br><br>Defendant and Appellant. | F087041<br><br>(Super. Ct. No. CRF16969)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In 2005, a jury convicted defendant Joshua Michael Mejia of first degree murder (Pen. Code, § 187, subd. (a)) and the court sentenced him to 25 years to life in prison. (Undesignated statutory references are to the Penal Code.)

In 2019, defendant petitioned for recall and resentencing pursuant to section 1172.6 in light of the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). After issuing an order to show cause and holding an evidentiary hearing, the court denied defendant's petition. We previously reversed the court's order and remanded for a new evidentiary hearing after concluding the court applied the wrong standard at the evidentiary hearing. The court then held another evidentiary hearing after which it again denied defendant's petition for relief, concluding the evidence proved beyond a reasonable doubt that he was the actual killer and/or a major participant who acted with reckless indifference during the underlying felony. Defendant testified during the evidentiary hearing. His primary defense both during trial and at the evidentiary hearing was that another individual was the perpetrator of the killing.

Defendant now challenges the denial of his petition after the evidentiary hearing, arguing the court erred in excluding certain evidence during the hearing; the evidence was insufficient to establish he was the actual killer or a major participant who acted with reckless indifference to human life; and the court erred in failing to consider defendant's youth at the time of the commission of the crime.

We reject defendant's contentions and affirm the order denying the petition.

## FACTUAL AND PROCEDURAL HISTORY

### *Petition for Resentencing*

In 2019, defendant filed a petition for recall of his sentence pursuant to former section 1170.95, now section 1172.6, and a declaration in support. He stated he was convicted of first degree murder in 2005. He asserted "[t]he prosecution chose to argue two distinct theories of criminal liability—either that [defendant] was directly guilty of murdering the victim … or that [defendant] took part or was present during a robbery, or theft in which the victim was murdered by [the] Codefendant[, Joshua Perry]." Defendant asserted the jury was presented with the felony-murder theory of liability and the natural and probable consequences doctrine as a basis for finding defendant guilty of

2.

murder. And the verdict forms did not indicate which theory the jury relied upon to find him guilty. He further asserted new evidence could either "exculpate him of direct-murder liability or strengthen the finding of 'natural probable consequences liability[']  and still require vacation of the conviction." Defendant requested the appointment of counsel, that he be present for any hearing, and stated he did not "waive any appearances involving any matters." After the parties submitted briefing on the petition, the court issued an order to show cause and set the petition for an evidentiary hearing.

***Remand for New Evidentiary Hearing***

The court previously held an evidentiary hearing after which it denied defendant's petition for relief. (See *People v. Mejia* (May 27, 2022, F081930) [nonpub. opn.].) Our court reversed the court's order, concluding it applied the incorrect standard at the evidentiary hearing. (*Ibid.*) Following issuance of the remittitur, the trial court calendared the matter for a new evidentiary hearing.

Before the hearing, the parties filed additional briefing. The People asserted defendant was ineligible for relief because the record clearly showed he was the actual killer. They also argued that "the legislature specifically used the phrase 'could not be convicted' and therefore it has adopted the 'sufficiency of the evidence' standard …."

In his brief, defendant asserted the People's response and the evidence presented at trial did not provide proof beyond a reasonable doubt he was the actual killer, an aider and abettor of murder, or a major participant in the robbery or burglary who acted with reckless indifference to human life. Defendant noted he intended to introduce additional evidence at the evidentiary hearing not previously produced at trial, namely, witness testimony from Diane M., who is Joshua Perry's sister, and Investigator Kelvin Moses. He asserted, on May 16, 2005, Diane M. spoke with Moses. Defendant recounted, Moses stated he asked Diane about Perry's whereabouts on March 2, 2005, the day of the murder. Diane reported that Perry was home that morning, noon, and evening and he left the house in his Mustang around 2230 to 2300 hours that night and returned the following

3.

morning wearing a different pair of shoes. "She said there was also a time where [Perry] had been washing the Mustang at least a few times and he said he burned the front floor mat to the Mustang"; Perry told Diane there was dog "poop" on the floor mats. Defendant asserted, "[t]his information was not brought out by either party at the 2005 trial," and the defense intended to "call Diane M[.] and Kelvin Moses to introduce this evidence," which would "tend to prove that, in addition to the fact that Joshua Perry was mysteriously gone around the time of the murder without an alibi, he was also soon thereafter attempting to get rid of forensic evidence including floor mats (for a vehicle that belonged to his girlfriend, Jennifer …), his shoes, and forensic evidence on the vehicle itself."

## *Jury Trial Evidence*

The jury convicted defendant of first degree murder after the presentation of evidence. At the evidentiary hearing, the parties and the court agreed to consider the reporter's transcript from defendant's underlying jury trial. The following evidence was presented during defendant's jury trial.

### **Prosecution's Evidence**

The victim, Robert Johannes, was 48 years old and lived in a house in Sonora owned by his mother. The house was located on a hillside and was somewhat secluded. There were approximately 75 stairs to access the entry to the house.

Johannes suffered an on-the-job injury in 2001 that damaged his sciatic nerve and created numbness down his right leg and in his arms; the best position for him was "to be in bed or sitting stationary." As a result of the injury, Johannes received $382 every two weeks as worker's compensation starting in 2003. He also received a lump sum payment of $5,000. He used the money for his everyday expenditures and, in 2003 and 2004, he gave his sister about $3,000 to take his twin daughters to Disneyland, as well as money to get his children Christmas gifts, including a GameCube, PlayStation games, and clothing.

Johannes's sister noted Johannes had his own PlayStation. She also testified Johannes kept cash in the house, $600 to $700.

Johannes suffered a stroke in 2002 that resulted in lasting impairments that required him to use a cane. Johannes's sister described him as being "frail" as of January 2005. She identified pieces of jewelry introduced into evidence as items she brought back to Johannes in June 2003 after their aunt passed away. She also testified Johannes had a "black type gun" he got for Christmas in 2004. Her husband recalled Johannes also had a dark blue, single-action Ruger Blackhawk .44 Magnum handgun and a BB or pellet gun; he identified an exhibit introduced at trial as looking like the BB gun that belonged to Johannes. The serial numbers on the handgun had been ground or filed off; Johannes kept the handgun in his room in a blue Smith & Wesson case.

Rachel Demore was originally charged with the offense in this case and agreed to testify truthfully in exchange for the murder charge against her being dismissed. A pending misdemeanor battery charge against her, where defendant was the victim, was also dismissed as part of the agreement.

Defendant lived with his parents a couple of blocks away from Demore in the Crystal Falls neighborhood. Demore began dating defendant when she was 17 years old. Demore and defendant were in a serious relationship; they lived together for three years, first in Demore's mother's house before they moved to defendant's parents' house. They eventually moved into a garage/studio apartment owned by one of defendant's friends, Jason McIntire. Defendant and Demore paid $400 a month in rent. Around December 2004, Demore and defendant both frequently smoked methamphetamine every day. They had a "very difficult" time getting money and would "constantly be calling [defendant's] parents for money." Defendant's parents gave him $100 on his birthday in February 2005, which he used to buy a pair of boots and other things. Demore identified defendant's boots at trial. In March 2005, they did not have enough money to make their rent payment.

Demore testified defendant constantly talked about doing a "comeup," and he talked to several people about it, including Chris Goodrich, Jeff Goldstein, Jason Gerner, Ryan Cann, and Joshua Perry. Demore explained, "A comeup is … getting anything that you can that's worth something that you can get money off of." Demore never heard any of the people defendant talked to agree to get involved with the comeup; "Josh Perry was the only one that was really actually enthusiastic about it." Defendant and Perry "talked a lot" and Perry appeared to be interested in the comeup.

Demore testified defendant discussed doing the comeup on Johannes, whom she and defendant knew because they would bring him drugs. Demore had been to Johannes's house four or five times during which they would do methamphetamine. Johannes "would always keep this envelope of money next to his bed on the stand and he would always bring it out" when they came over to "give [them] money to go get him meth." It looked like "[a] lot of money, probably a couple thousand it looked like; it was a big thick envelope." Johannes had a pistol in a blue carrying case. Demore described Johannes as "frail"; "he had a stroke," "didn't get up often," and walked with a cane.

With regard to doing a comeup on Johannes, defendant would say "he knew this guy that has a lot of money and it would be a good comeup and he wanted to … go up there and beat him up and rob him." He started talking about it in December 2004, months before March 2005.

On March 1, 2005, Demore and defendant stayed the night at McIntire's house and then left the afternoon of March 2, 2005. They went to Steven Donahoo's house and he "fronted [them] some meth," meaning he gave them drugs and they were going to repay him later. Then, defendant and Demore went to Johannes's house. Johannes was home and defendant and Demore smoked methamphetamine with him in his bedroom. They sat with Johannes for a while and then Demore started cleaning because they owed Johannes some money; Johannes had previously given them money for drugs and they never came back with them. Demore vacuumed, wiped down the counters, cleaned the

stove using 409 cleaner, did the dishes, and straightened up. She emptied the trash in Johannes's room and denied seeing any pornographic magazines in the bedroom.

Demore saw defendant bring Johannes a cup of Kool-Aid. At some point, Mary Machado came over with her son Casey. Johannes told Machado to taste the Kool-Aid because it "didn't taste right." They dumped the Kool-Aid over the rail on the upstairs deck.[1] Defendant came downstairs with the cups and told Demore "he had put something in the drink to make him go to sleep." Demore noticed there was a bottle of 409 underneath the sink and the top was twisted off.

The Machados left at about 6:30 or 7:00 p.m. Demore was downstairs and defendant and Johannes were upstairs. Demore went upstairs after she was done cleaning the kitchen, and she sat with defendant and Johannes for a little while before telling defendant she was going downstairs and would be in the truck. She walked out of the house and to the truck. When Demore walked out of the house, Johannes's cane was hanging on the back of a dining room chair. When presented with a photograph of the cane on the couch, Demore denied the cane was in that position when she left the house.

Demore sat in the truck for five or 10 minutes. It was very dark. The lights outside of the house went out and Demore went up the stairs to the house and opened the

---

[1]Mary Beth Machado lived in a motor home on the property below Johannes's house until October 2004. She testified she knew Johannes "[v]ery well" and was aware that he used methamphetamine at "one point way back when." Machado testified that on March 2, 2005, she and her son Casey went to Johannes's house between 4:30 and 5:30. Casey bought Johannes's car, a green Chevy Malibu, for $150, and went over to pick it up. Defendant and his girlfriend Rachel Demore were there; Demore was vacuuming and defendant was upstairs talking to Johannes. Defendant lived three driveways down at the time. Machado testified she went upstairs and sat on the bed where Johannes was sitting. Defendant was standing by the bedroom door. Machado took a sip of a glass of Kool-Aid that was on Johannes's nightstand, but "there was something wrong with it so [she] spit it out." "[I]t tasted like kerosene or gas or something." Machado dumped the glass of Kool-Aid out. She told defendant to taste it and he said "no," and that he had already drank two glasses of it and thought it was fine. She had defendant "go down and get the pitcher of Kool-Aid and had him dump it out upstairs over the railing on the deck." Machado left between 6:00 and 6:30. Defendant was upstairs and Demore was downstairs when Machado left.

sliding glass door.  It was pretty dark but she saw defendant standing in the living room next to the dining table and the couch.  She asked him what was going on and he put his finger to his lips signaling to her to be quiet and to go back outside, so she did.  She testified, "It was quiet for a minute and then I heard what sounded like a wrestling match going on."  Demore heard "banging, like somebody was wrestling, and that went on for a couple minutes and then it went quiet and a couple minutes later, [defendant] ran down the driveway and he had a [blue] pillowcase over his shoulder and it had a bunch of stuff in it."  Demore testified she knew defendant wanted to rob Johannes, but she did not believe he was going to do it.

Defendant "threw the pillowcase in the back of the truck and he jumped in and started the truck."  "He was pretty shook up."  Defendant told Demore that Johannes came downstairs, held the cane up, and swung at him and then they started wrestling.  Defendant said they ended up in the bathroom and defendant hit Johannes "several times over the head with the cane" and "he stomped on his chest and then he beat him up with his fists."  Defendant stated Johannes "wouldn't knock out when he was hitting him," and Johannes kept saying, "'I didn't mean to touch her, I didn't mean to touch her.'"  Defendant said Johannes was "a child molester or something."  After defendant hit Johannes over the head with the cane and they struggled, defendant went upstairs and "grabbed everything that he could and he said when he flipped up the mattress, he found like child pornography and like a bunch of sex toys and he threw them all over the place before he left."  When he got in the vehicle, defendant said he needed to go back up to "get the cane," but he did not go back to retrieve it.  Demore asked him not to because it did not feel "safe."  Defendant's hand looked broken, "it was swollen up huge."

Demore testified they then went to Steven Donahoo's house where defendant took the pillowcase into a bedroom and dumped out its contents on the bed.  Demore saw PlayStation and Xbox games, a black handgun and a blue carrying case, a BB gun that looked like a rifle, and a wooden box with jewelry inside.  They stayed at Donahoo's

house for about half an hour during which defendant gave David Donahoo, Steven's brother, the BB gun, glass pipes, and some jewelry. Two pairs of earrings were given to a girl who was at the house. Defendant and Demore then left and went to Jason McIntire's house. Defendant told Demore to take off her clothes and shoes and change them. He took off his sweatshirt and his pants but not his boots, put everything he did not want in a bag, and then he put the bag with the clothes in a burn pile and burned it. The police later recovered jewelry from a burn pile at McIntire's house after Demore directed them to it.

Demore testified they slept at McIntire's house and woke up around noon on March 3, 2005. Defendant wanted to "sell everything," so he started contacting people. Defendant changed from his boots into Converse shoes before he and Demore left the house to go to the house of Jason Akers.

Then, they went to see Perry who defendant said owed them money or drugs. It was dark by the time they got to Perry's place. Demore heard defendant tell Perry he beat up a child molester. Defendant gave Perry a panda bear pendant, two pairs of diamond earrings, some silver or gold chains, and a Hitler postage stamp. Johannes's ex-wife testified she had given Johannes a World War II stamp with Hitler on it. She identified a photograph of a stamp introduced at trial as similar to the one she had. Demore identified jewelry introduced at trial as the jewelry defendant gave to Perry.

Demore testified they arrived at Jason Akers's house at around 3:30 or 4:00 a.m. and slept in their truck in his driveway until he invited them to come inside and sleep. Defendant gave Akers a couple of video games. They stayed at Akers's house until March 5, 2005. Then, they went to defendant's aunt's house and borrowed money before they drove to Salinas where they stayed with defendant's brother. Defendant and his brother sold the black gun in exchange for a hundred dollars and a good amount of cocaine. Defendant and Demore then went to stay in Prunedale. They learned there was a warrant out for their arrest. Defendant told Demore he threw his boots in the bushes.

9.

The police recovered boots with blue insoles in Prunedale in August 2005. Demore showered and then turned herself in.

Demore testified Perry was not present at Robert Johannes's house the night of March 2, 2005. She testified she never saw a black Mustang drive up and defendant never told her that Perry had shown up. No one was in the house when the homicide took place other than defendant.

On March 3, 2005, a realtor who was handling the listing of Johannes's residence went to the house and knocked on the door, but no one answered. The sliding door "was open just a hair." The realtor opened the door, walked in, and called for Johannes but received no response. As he turned to the left upon entering, he saw Johannes's legs. He "kind of kicked his leg and that was enough," he "turned around and ran out." The realtor went to his office where he called Johannes's sister and asked her what she wanted him to do. She told him to call 911, so he did.

The paramedics arrived and found Johannes on the floor. They determined he had "been down for a long time" and "obviously dead." There were blood drag marks coming from the living room, across the kitchen to where Johannes's body was in the bathroom.

Deputy Sheriff James Gragg arrived at the scene at 4:26 p.m. Johannes's upper body was in the bathroom and his legs extended into the kitchen. In the living room, there were two bloodstains near a recliner and a blood streak across the carpet onto the linoleum floor of the kitchen that led to where the victim was lying. A cane was laying on the couch and taken into evidence. The rubber tip of the cane had come off but was found in the living room near a woodburning stove. There were red stains on the shaft of the cane that were later tested and determined to be human blood. There also appeared to be blood on the couch and there were two partial bloody shoe prints on the kitchen floor, one by the stove and one coming from the living room area. The shoe prints were photographed and later compared to defendant's right black boot and determined to be

10.

similar though they could not be positively identified; the boots tested negative for blood. There was blood splatter on the walls and the cabinets around the victim's body and on the bottom part of the shower curtain. There were vacuum cleaning marks on the carpet. On the second floor of the house, there was a nightstand next to the bed that "looked like it had been riffled through." No child pornography or photographs of children in sexual poses were found. One pornographic magazine called "Naughty Neighbors" was found underneath the bed. The scene was processed for latent prints and 10 "lifts" were taken. An impression taken from the stove matched defendant's right palm. Seven latent impressions were taken from the cane, four of which were matched to defendant. None of the prints on the cane matched Johannes.

The criminalist who investigated the scene opined "[t]he victim was beaten near the bottom of the stairs on the first floor, he was drug around to the side of the recliner, then from there he was drug back to his final position where we found him in the bathroom, and in the bathroom he was beaten some more." And it appeared the victim was on the floor when the skin on his head was broken and bleeding; "[h]e could have been struck before and … no bleeding occur[ed], but … once he started bleeding, he was never upright sitting … or walking." The criminalist further opined the cane was "probably used to strike the victim" given the blood on the cane. An examination of the victim's clothing at the scene revealed he had $147.15 on his person. One investigator noted there appeared to be a partial shoe print on Johannes's shirt after it was removed from the body. The patterns of the prints on the kitchen floor were different from what appeared on the victim's shirt. Based on the shirt, the investigating detective testified it appeared there were more than two people in the house at or near the time the victim was killed. After examination, no blood was found in defendant's or Perry's car. A pool cue was recovered from Perry.

The pathologist who conducted an autopsy of Johannes's body testified at trial. There were numerous blunt force injuries on Johannes's body. They were concentrated

11.

around the head, and there was extensive bruising throughout the face and head suggesting there had been "extensive beating." There were also some minor blunt force injuries on the extremities, including a "band-like area of blunt force impact" on the back of the left forearm that could have been caused by "a linear weapon."

When shown a photograph of an aluminum cane, the pathologist testified the cane was consistent with the lacerations on Johannes's body. "[T]here were undisplaced fractures of the base of his skull," "where the brain sits," which was a potentially fatal injury that resulted in a brain hemorrhage. Johannes also "had very significant chest injuries and neck injuries." His hyoid bone was fractured, which "would cause severe spasm of the airway" and cause a person to suffocate. The pathologist opined "there was a blow or a stomp to the neck causing this fracture." There was also injury in the abdomen from blunt force, "like maybe a knee or a stomping injury, and there was laceration of the liver and of the spleen," which were also potentially fatal injuries as a result of internal bleeding. The pathologist explained, "This person died of a combination of the injuries, but could have died from … any two of them or maybe even any one of them; chest, abdomen, neck, head." He testified the photographs and autopsy results "demonstrate that [the victim] was very much alive during the infliction of all of these blows and probably died within minutes afterwards." He opined the cause of death was "[s]hock and hemorrhage and asphyxia due to multiple blunt force injuries; in other words, he went into shock from hemorrhage, but he also had some component of asphyxia from the lung problem, chest problem and the neck injury." The toxicology report revealed methamphetamine was present in Johannes's system, and the amount "was many times greater than therapeutic level so he was intoxicated."

Ryan Cann testified defendant once asked him if he was interested in helping with a robbery. Perry and Jason Gerner were present. Gerner also testified that something was mentioned regarding a "comeup," but he "wasn't really interested so … wasn't

12.

paying attention."[2] Defendant did not give the name of a target but "it was indicated that he might have known a person." No one pursued the conversation with defendant and defendant left shortly after that. Jeffrey Goldstein also testified defendant asked him to assist in a robbery of a person at Crystal Falls; defendant said there was money there. Defendant described the house and told Goldstein it had a steep driveway and it was a couple of houses down from defendant's parents' house. Goldstein reported to the police that defendant mentioned $6,000 and offered Goldstein $2,000.

Steven Donahoo testified defendant told him he was going to do a "comeup," meaning get money from someone who had $6,000, the day before or the morning of the murder. Steven's brother David also recalled defendant mentioning a "comeup." Steven gave defendant methamphetamine in exchange for marijuana on the day of the murder. Steven testified defendant and Demore were supposed to go to storage to get some stuff and bring it back to the Donahoo house because they were going out of town. They left the Donahoo house that afternoon after getting the methamphetamine and then returned in the early evening. Defendant had a blue pillowcase with him when he returned that he took to the bedroom. From the pillowcase, Steven saw defendant take out jewelry, some coins, some DVD's, some Nintendo games, a BB gun, and a big .44-caliber handgun.[3] Defendant's fist was swollen, and he told Steven he "punched some dude" and "laid the guy out." Steven told defendant to "pack it up" and get it out of his house. Steven did not take any of the items, but David took the BB gun, PlayStation games, jewelry, and a "bag full of nasty looking pipes, broken glass." Based on information the police later received from Demore, the police went to the Donahoo residence on May 3, 2005, and

---

[2]Gerner also testified Joshua Perry had given his name as an alibi but Gerner could not provide one because "he came over a day" but Gerner did not "know whether it was before or after the newspaper clipping came out."

[3]David Donahoo also recalled defendant having a bag "that supposedly came from a storage" that had several items, including PlayStation games and jewelry.

13.

David Donahoo gave them a BB gun and two Sony PlayStation games. At a later date, he also gave the police two pairs of earrings.

Jason Akers testified that when defendant and Demore stayed at his house in early March 2005, defendant's hand was swollen. Defendant told Akers he hit someone. Akers gave defendant $40 because defendant told him he was trying to leave the county. Defendant gave Akers a couple of PlayStation games.

Jacob Penrod also testified he encountered defendant on a Wednesday in early March 2005 between 9:00 and 10:30 p.m. Defendant was outside talking to Perry and then he came inside. Penrod went to shake defendant's hand and defendant told him to "take it easy on shaking his hand" and that "he beat up a child molester." Penrod recalled defendant's hand being swollen. Defendant stayed for 15 to 20 minutes. Perry showed Penrod some "little silver bracelets," "couple a pairs of earrings," "a panda bear pendant," and a postage stamp with a picture of Adolf Hitler on it. The next day Penrod smelled something funny and he woke up and saw Perry setting the stamp on fire. Penrod testified that he and Perry had lived together. He recalled that on March 2, 2005, Perry was at his parents' house and did not leave. Perry's girlfriend Jennifer was also there; there was a black Mustang at the house.

Perry's sister, Diane M., testified she lived with her mother, father, Penrod (who was her boyfriend), her two sisters, her sister's boyfriend, and her nephew. On March 2, 2005, Perry was homeless but he was coming in and out, staying at the house with them. That day, "he arrived at about 6:30 in the morning and then about 10:00 the cops showed up, searched him because he had possession of a stolen stereo, and he left that night about 10:00, 10:30." Perry and his girlfriend Jennifer were at the house all day. Jennifer had a black Mustang that Perry left in at around 10:30 at night.

Jason McIntire testified defendant and Rachel Demore lived in a little studio on his property in February 2005. They paid $350 or $400 in rent. They could not pay rent in March 2005 so were moving out. McIntire mentioned he used to burn brush and

14.

leaves and debris on his property and he was served with a search warrant on April 25, 2005. McIntire showed the investigators the burn pile.

**Defense Evidence**

Defendant testified on his own behalf. He stated he began living with his girlfriend, Rachel Demore, in late 2003. They went back and forth living at Demore's mother's house and defendant's parents' house. Defendant's parents sold their house in December 2004 and defendant and Demore went to live in their friend Jason McIntire's house. The rent was $400 and approximately an extra $50 for utilities. Defendant's mother paid the rent because defendant was "not fully employed." Defendant stated that, around 2003, Demore introduced him to methamphetamine. He testified that Demore could "get violent," and she was arrested after an incident with him on February 14, 2005, when she hit him in the nose.

When defendant was around 16 years old, he met Robert Johannes. Johannes lived three doors down from defendant and would pay defendant to do chores for him like stacking wood. Defendant noted Johannes was "somewhat disabled."

In the summer of 2004, defendant began going to Johannes's house with Demore. Johannes would give them money to buy him methamphetamine. They would take it back to Johannes and he would share it with them. They did this about 10 times. On one occasion on February 26, 2005, they did not return to Johannes's house with the drugs and Johannes was angry. Defendant called Johannes to apologize two days later and Johannes just wanted him to make up for it.

Defendant testified Johannes had an envelope of money at his house and he kept the envelope on his nightstand right by his bed. Defendant admitted he told people there was a large sum of money at the house but "he did not state a full amount." Defendant denied planning to go to Johannes's house to take the money with the people who testified he was trying to solicit them to help him. He testified, in talking about the

15.

money, he was just "putting it … like a fantasy." Defendant stated no one agreed to go with him to take the money, but Perry agreed it was a good idea to do this comeup. Defendant testified he and Perry were acquaintances. Defendant denied making "firm plans" with Perry to go to Johannes's house to take any money. But he stated he implied to Perry that if Perry saw defendant's car there, he was there.

Defendant testified he went to the McIntire house on March 1, 2005, to pack up his belongings because he could not afford the rent. He stayed there that night and woke up the next day at around 1:00 or 2:00 in the afternoon. He and Demore left approximately 30 minutes later and went to Steven Donahoo's house, which was about 10 minutes away. Defendant and Demore then went to Johannes's house around 3:00 p.m. to "reconcile with him, make up for the money that [defendant] owed him." Defendant testified he brought Johannes some methamphetamine he got from Steven Donahoo, and defendant and Demore smoked it with Johannes in Johannes's bedroom. Then, Demore began cleaning the house to help make up for the money they owed Johannes. Defendant played video games with Johannes for about an hour and a half and they talked for a while before defendant started to help Demore clean the house.

At around 5:30 p.m., Mary and Casey Machado came over for about 30 minutes. Defendant testified there was a pitcher of Kool-Aid in Johannes's refrigerator. He denied making it or putting anything in it. Defendant stated he had two cups of the Kool-Aid and it tasted "different"; it had an aftertaste. At some point, Mary Machado called defendant upstairs to taste the Kool-Aid. Machado told defendant Johannes said the Kool-Aid tasted weird. Defendant tried it and it tasted awful. Defendant denied telling Demore he put something in the Kool-Aid to try to make Johannes go to sleep.

After the Machados left, defendant was upstairs talking to Johannes while Demore vacuumed, picked up the garbage, and dusted downstairs. Johannes went to the bathroom and Demore called defendant downstairs to grab the trash container and take it upstairs to empty the trash upstairs. Defendant testified he emptied a small waste basket in front of

16.

the nightstand when he saw a "Naughty Neighbors" magazine.  Defendant looked through the magazine and, about halfway through, he found some Polaroid pictures that looked like Johannes's daughters in some sort of sexual act.[4]  Defendant "was really disgusted."  While Johannes was still in the bathroom, defendant grabbed a pillowcase and stuffed it with video games and a BB gun.  He stated he did not know why he did that but was "somewhat incoherent" when he saw the pictures and "was disgusted at what [he] had seen."  Defendant denied looking for money.  He later testified he went downstairs with the pillowcase and put it outside of the sliding door and then went back upstairs.

When Johannes got out of the bathroom, defendant told Johannes "these look like his daughters," and he "accused him of being a child molester" and "actually asked him if he was a child molester."  Johannes got really mad, started cussing at defendant and told him to leave.  Demore came upstairs and wanted to know what was going on because she heard Johannes yelling at defendant.  Defendant told her that Johannes "was more than likely a child molester," and he told her about the pictures but did not show them to her.  Johannes got mad and told defendant to "get the hell out of the house."  If defendant did not get out now, "he was going to make my girlfriend give him a blow job for the money that I owed him."  Demore "got furious, she hauled off and hit [Johannes] on the left side of his temple with her right hand twice."  Johannes raised his cane in his right hand and defendant took it from him and threw it on the bed.  Defendant told Demore to go downstairs and he told Johannes he was leaving and was not going to come back.  Defendant went downstairs.  Demore was not there; defendant thought she was on her way to their vehicle.

---

[4]On rebuttal, the investigating detective testified no Polaroid pictures were found on the floor of the victim's bedroom and no Polaroid pictures of the victim's two daughters in sexual poses were found during the search of Johannes's residence.

He testified, then "Perry jumped out from behind the house over the railing … and wanted to know what was going on." They spoke outside and Perry asked defendant if they "were going to do a comeup." Perry said he needed money and wanted to do a comeup, and defendant told him that Johannes was "more than likely a child molester." Defendant explained he had spoken to Perry about a month earlier on one occasion regarding Johannes's money. Defendant denied Demore's statement that he had been talking about it for months and he denied that he and Perry agreed or planned to meet and take Johannes's money. Perry said he wanted money and wanted to do the comeup. Defendant said no; he "was leaving and … didn't want nothing to do with it."

Defendant testified he tried to stop Perry, but Perry went inside the house. Defendant went back in too and "tried to stop him." Perry ran up the stairs. Defendant heard some noise. Perry "said a few words to [Johannes]" and Johannes "wanted to know what the hell he was doing there." Defendant saw Johannes come to the door. Johannes had his cane in his hand and Perry was hitting him with his fist. Johannes fell to his knees and Perry pushed Johannes down the stairs. Defendant threw a piece of kindling wood at Perry when Perry was at the bottom of the stairs to try to stop him, but Perry did not stop.[5] Defendant wanted to leave because he "was scared"; Perry "was beating the hell out of him." Defendant saw Perry hit Johannes with Johannes's cane. He also testified Perry stomped on Johannes's chest and stomped "all over him." Defendant testified he walked down from the house and Demore was at the bottom of the stairs.

Defendant denied making the statements Demore testified he made when he got to the truck. Defendant testified he told Demore everything that he saw and that Perry had

---

[5]On rebuttal, the investigating detective testified a piece of firewood was found but not near the bottom of the stairs like defendant reported. Instead, it was found about two to two and a half feet from the sliding glass door, which was approximately eight to 10 feet from the bottom of the stairs.

done the beating. After they left Johannes's house, defendant and Demore went to the Donahoo house where defendant gave David Donahoo the video games and the BB gun. Defendant denied giving David the earrings but stated he believed Demore did and he did not know where she got them. Then, they went back to McIntire's house. Defendant "was really frustrated at the situation" and "punched [his] truck with [his] right hand on the passenger's side," noting he was left-handed. Defendant stated he has a problem in his pinky knuckle and that it "tends to swell" and his right hand was swollen on March 2, 2005, when he was at the Donahoo house. After sleeping at McIntire's house, they drove around and went to Jason Akers' home on March 4, 2005, at around 4:30 in the morning and slept in the driveway. Around 6:30 a.m., they spoke to Akers and slept in the house. Defendant denied telling McIntire or Akers that he beat up a child molester. Defendant admitted he told the investigators that he said this to McIntire, but defendant said "that statement was given to get [Demore] out of the involvement of the situation," and his statement with regard to telling Akers he hit a child molester was him doing his "best to remove [Demore] out of any involvement." Defendant also testified it was Demore who told Akers he hit a child molester.

With the money Akers had given them, defendant and Demore went to get food and then went to Perry's house because Perry owed defendant money, around $40, and Demore wanted to know what was going on, "she wanted to know the truth." Defendant talked to Perry outside of the house and Perry had defendant look at some jewelry. Defendant asked what happened to Johannes and Perry said "he was taken care of." Demore did not get out of the car and "stayed somewhat silent." After leaving Perry's house, they went back to Akers' house and spent the night. On March 5, 2005, defendant's aunt gave him some money that he and Demore used for gas and food and then they started driving to Salinas, but their truck broke down. Defendant's mother met them and helped them get to a motel to stay for the night. On the morning of March 6, 2005, they drove to Prunedale. When defendant found out there was a warrant out for his

19.

arrest, his mother contacted a lawyer and they turned themselves in. He testified he turned himself in because he knew he was innocent and he went back to Sonora to prove that. Defendant denied doing anything with his boots after finding out there was a warrant out for his arrest. He also denied burning jewelry or his clothes at the McIntire house on the evening of March 2, 2005. He also denied instructing Demore to take her clothes off but stated she threw a bag containing a bunch of clothes in the fire along with a small wooden box. Defendant stated he burned "junk that we didn't want to take with us to Salinas" like a coffee table and paperwork. Defendant admitted he repeatedly lied to the investigators when he spoke with them while in jail on March 15, 2005. He testified he gave the statement "[s]trictly to get [Demore] off and out of any involvement." He also admitted telling the officers that he hit Johannes twice with his left hand and once with his right hand, which, he testified, was a lie.

Defendant's mother, Mrs. Mejia, testified that "they gave him the money to rent a place" with his girlfriend, Demore, in December 2004. Mrs. Mejia left Sonora to move to Salinas at that time; defendant and Demore had previously been living on her property. On March 4th or 5th of 2005, Mrs. Mejia called her sister in Sonora to give defendant money to come to Salinas. Defendant's car broke down on the highway, so Mrs. Mejia and her husband met him and Demore and helped them get to a motel. She gave them money for the room and for food. Defendant and his father worked on fixing defendant's truck. Mrs. Mejia did not notice any injuries on defendant, including on his right hand.

The defense called Chace W. and asked "[d]id he and Josh Perry go over to a house in Crystal Falls and stomp someone." Chace W. denied the allegation or telling his parents he did that. Chace W.'s mother, Mrs. W., testified Perry and his girlfriend stayed at her house on "the night of the murder." Chace's father, Mr. W., also testified he recalled Perry and his girlfriend Jennifer stayed at their house one night. Mrs. W. testified she did not know if Perry left the house for an hour to two hours that night because she was upstairs asleep. But Mr. W. recalled Perry left their house in a black

20.

Mustang at about 1:00 a.m. to get cigarettes, though Mr. W. later testified he did not know what time it was but it was dark outside. Mr. W. testified Perry was gone for about an hour or hour and a half.

Mrs. W. testified that on March 3d or 4th, Perry tried to sell her jewelry—some gold earrings with a diamond and a panda bear pendant. Mrs. W. also testified Chace told her he did not know anything about a homicide. Mr. W. recalled Perry showing him the jewelry, too. Mrs. W. testified that Perry's parents called her to come over to talk about their sons around March 4, 2005. Mrs. M., Perry's mother, denied calling the W.'s but she testified they came over. She stated Mrs. W. "was hysterically crying," "she just kept crying, 'My son's going to prison for murder.'" Mr. M., Perry's father, recalled meeting with the W.'s and also testified Mrs. W. said her son was going to go to prison. He further stated he believed the W.'s wanted to talk to him and his wife about Perry and Chace going to a home on the evening of March 2, 2005.

Diane M., Perry's sister, testified she was at her home on March 2, 3, and 4, 2005. She saw Perry leave the house in his girlfriend's black Mustang at around 10:30 p.m. on March 2, 2005. She went to the W.'s house the following "Tuesday, [March] 6th or 7th." (March 8, 2005, was a Tuesday.) While there, Mrs. W. told Diane that Perry and Chace were involved in a homicide. Diane testified Chace was not acting like himself. "He was under the influence of methamphetamines, he was crying, slamming stuff around the house and getting into arguments with his parents to where his dad had to physically put him down on the couch." Mrs. W. told Diane that Chace had gone with Perry to Crystal Falls on Wednesday, March 2d.

Carl Greenway testified he encountered Perry on March 2, 2005, at around 8:30 or 9:00 p.m. Perry drove up in a black Mustang and was acting "scared in a way but like he just did something wrong." Perry was "agitated" and "wouldn't get out of his car." Greenway was meeting Perry to get some crystal meth from him. Greenway testified Perry had "a lot of money on him" that day that he was "flashing … around," between

$4,000 and $5,000; the cash was in a roll. Greenway testified he saw a check stub with the name Robert Johannes or Robert Johnson on it that also said "United States Treasury."[6] It was "wrapped around the money with a rubber band." Greenway testified he and defendant had known each other for "[q]uite a long time," over six years, and they were friends. Greenway explained he was also in custody at the Tuolumne County jail with defendant and had spoken to him through the doors. Defendant told him "[a] little bit" about the case and Greenway told defendant he was willing to help him out.

### Rebuttal Evidence

The prosecution called Joshua Perry in rebuttal. Perry admitted that he was once a defendant in this action and he entered a negotiated plea in August 2005. As part of the plea bargain, Perry pleaded guilty to conspiracy to commit robbery and receiving stolen property in this case and other crimes in an unrelated case in exchange for a stipulated sentence of six years eight months.

Perry denied knowing Johannes, ever meeting him, or ever going to Johannes's house, including on March 2, 2005. He denied stomping on Johannes, hitting him, killing him, or stealing anything from him. He testified defendant gave him some jewelry on March 2, 2005, and Perry disposed of it by throwing it off the side of the road. Perry later took law enforcement to where the jewelry was thrown. Perry denied knowing Carl Greenway or showing him some money. He testified when he was arrested there was a pool cue handle in the car he was in, a black Mustang.

Demore also testified in rebuttal. She denied going to Johannes's bedroom area during an argument between him and defendant or hearing defendant call Johannes a child molester. She denied that Johannes raised his cane so as to hit her or defendant, or

---

[6]Defendant testified he told investigators that Johannes was getting a federal check, "like a disability check." On rebuttal, a private investigator who interviewed Carl Greenway on September 26, 2005, reported Greenway did not tell her he saw a federal check stub with the victim's name on it in Perry's possession.

that Johannes said, "'If you don't get out, I'm going to make Rachel give me a blow job'" for the money they owed him. She also denied hitting Johannes. She denied seeing Perry drive up when she was at Johannes's house or that defendant told her that he saw Perry beat Johannes. She denied giving earrings to anyone at the Donahoo house and stated defendant gave earrings to a girl while there. Demore testified defendant got Converse tennis shoes from McIntire after the homicide.

Johannes's sister testified she had access to the checks Johannes received and she had seen checks he received from the State Compensation Insurance Fund. She testified the checks did not have Johannes's name on the receipt portion.

***Testimony at the Evidentiary Hearing***

At the section 1172.6 evidentiary hearing, the defense called Diane M. to testify. When asked where Joshua Perry was on the night of the murder, March 2, 2005, Diane M. testified she did not recall. She stated: "To be brutally honest, I was a child. I was a drug addict. I do not know what was real, what was not. At this point, it has been so long in time." When she was asked whether Perry washed his girlfriend's Mustang in the three or four days after the murder, Diane testified, "Not that I recall, no." Defense counsel asked Diane if she recalled her "brother burning the floormats, or a floormat, or the floormats to that Mustang." She responded: "No. However, I do recall that being said. That accusation came from my father, [Mr. M.]. My father has been dead for 12 years." She clarified, "I do not know if that was real. I do remember that being said by my father. I, myself, do remember agreeing with any and everything my father said. Being a child, I agreed with everything he had said. As to that, no, I myself never saw any of that."

The defense also called investigator Kelvin Moses who testified he was the lead investigator into the murder of Robert Johannes in 2005. He spoke to Diane M. on May 16, 2005. She reported that Perry washed the Mustang after the murder and she also said he burned the floor mat to the Mustang. But Diane did not say she saw Perry burn

23.

the floor mat. Moses testified he did not see any signs of intoxication or possible drug use when he spoke with Diane, otherwise he would have documented it.

At the continued hearing, the court stated its "recollection" was that Diane M. testified "she was on meth every day, including the day of the murder, she doesn't know reality from fantasy, and never saw him burn the floor mats. She may have heard her father say that and she just says whatever her father says," "[a]nd the detectives said she never said she saw him burn the floor mats." Defense counsel asserted his "recollection was a little different." He asserted "the officer said that at the time she said something slightly different, that she had seen these things." The court responded, "Yes. Well, I think she said that he had done it, but she didn't say that she saw him do it is what the detective said. But neither here nor there, I think that it's not super important for purposes of our hearing today."

Defense counsel argued defendant testified in 2005 that Joshua Perry committed the murder and "he was making attempts to make it so Mr. Perry did not do that, it wasn't his intention to do that. So he certainly couldn't be convicted today of being an aider and abettor or being … a major participant who had a depraved heart …." He asserted the only issue was whether defendant was the actual killer and, he argued, there were "many reasonable doubts" and no "direct evidence" defendant actually did the killing.

### Court's Findings and Denial of Petition

After the parties presented evidence and their arguments at the evidentiary hearing, the court noted its "role in a Section 1172.6 proceeding is to act as an independent fact finder and determine in the first instance whether the petitioner committed murder under the laws as amended by Senate Bill 1437."

The court stated it "heard testimony from Diane M[.] and former detective Kelvin Moses. Both of their testimony dealt with the issue whether Diane's brother, Joshua Perry, burned floor mats from his girlfriend's Mustang vehicle. Ms. M[.] testified she was using meth every day around the time of the alleged floor mat burning. She said she

24.

is incapable of distinguishing reality from fantasy. She did not recall seeing her brother burn the floor mats. She may have heard her father say something about Joshua Perry burning floor mats and that she would have just agreed with her father, whatever her father told her. [¶] Detective Moses testified that Ms. M[.] told him that Josh Perry burned the floor mats but did not say she saw him do it." The court found: "The testimony of these two witnesses does not even establish that Joshua Perry burned any floor mats and so it cannot form the basis of any conclusion that he was involved in the murder."

The court then summarized the evidence introduced at trial, including defendant's testimony. The court noted defendant's testimony was "completely inconsistent with the testimony of Ms. Demore" and "inconsistent with the other witnesses who testified about [defendant] admitting that he had beaten up a child molester and then committed a robbery." The court stated it did not find defendant's "testimony credible based on the contradictions with all of the other witnesses and the inconsistencies within his testimony."

The court found the People met their burden of proving beyond a reasonable doubt that defendant was guilty of murder under the new laws. Specifically, the court found the People had satisfied their burden of proving beyond a reasonable doubt that defendant was the actual murderer. The court further concluded, based on defendant's testimony, "even if the jury believed him, he was clearly an aider and abettor in the burglary" and "a major participant in the underlying felony and act[ed] with reckless indifference to human life." The court discussed the five factors articulated in *People v. Clark* (2016) 63 Cal.4th 522, 618–622 in discussing its reckless indifference finding. It noted defendant admitted he was at the scene of the crime and, according to his own testimony, "Perry was brutally beating Mr. Johannes." Defendant knew "Mr. Johannes was frail and also on meth," and "defenseless against Perry both before they entered to commit the burglary and while the fight was on." Defendant did not "meaningfully intercede" nor "render aid

25.

to Mr. Johannes"; "[i]nstead he just grabbed the loot and left." With regard to duration of the felony, the court noted defendant "was at the victim's residence for a substantial period of time before he claims that Perry arrived. He knew full well of Mr. Johannes' preexisting conditions and of the spiking of the drink. He knew the victim was home and did nothing to prevent the burglary from occurring when the victim was home. According to Ms. Demore, [defendant] told her that he put something in the Kool-Aid to get Mr. Johannes to sleep, but he also knew Mr. Johannes was not asleep despite spiking the Kool-Aid."

Based on its findings, the court denied defendant's petition for resentencing. After the court stated its findings, defendant addressed the court. He asserted he had "not been given a meaningful opportunity to show that the totality of circumstances have been met for the reckless indifference standards," and "[y]outh defender factors are a big play in this part." Defendant also argued additional evidence should have been presented on his behalf. The court stated its ruling was limited by the evidence presented and it reiterated its ruling.

## DISCUSSION

Defendant now challenges the trial court's findings at the evidentiary hearing, alleges various errors, and contends he is entitled to a remand. As discussed herein, we reject defendant's contentions and affirm the court's order.

### I.     Senate Bill 1437 and Senate Bill No. 775

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amended

26.

section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime*." (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, former section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The legislation also added former section 1170.95, which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, former section 1170.95 permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that

27.

sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ...." (Stats. 2018, ch. 1015, § 4, subd. (a).)

In Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022, the Legislature amended the language of this section to expand the scope of the petitioning procedure. (Stats. 2021, ch. 551, § 2.) Under the amended statute, if the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (Former § 1170.95, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must then hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (Former § 1170.95, subd. (d)(1).)

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (Former § 1170.95, subd. (d)(3), renumbered as § 1172.6 by Stats. 2022, ch. 58, § 10, effective June 30, 2022.)

28.

## II. Standard of Review

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) We will not reverse unless it appears that upon no hypothesis is there sufficient substantial evidence to support the fact finder's findings. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

## III. Court Did Not Improperly Exclude a Witness's Prior Statement

Defendant first contends the court erred in excluding Diane M.'s prior statement regarding whether Perry burned the Mustang's floor mats around the time of the murder. He contends the trial court "treated Ms. M[.]'s 2005 police statement as inadmissible hearsay," but "[t]here is a lack of basis in the record to conclude Diane M[.] repeated hearsay in her police statement." He argues the court should not have disregarded the evidence Perry burned the floor mats of his car, which showed consciousness of guilt. The People respond that the court did not exclude Diane's prior statement as inadmissible

hearsay. Rather, they contend the court gave Diane's statement little, if any, weight on the issues presented in the section 1172.6 hearing as it was entitled to as an independent fact finder. We agree with the People that it does not appear the trial court excluded Detective Moses's testimony regarding Diane's prior statement. Rather, the court concluded, even considering such evidence, it did not establish that Perry burned any floor mats, so it could not support a conclusion Perry was involved in the murder.

At the evidentiary hearing, the trial court, as the fact finder, was tasked with determining how much weight, if any, to afford to the evidence presented. (See *People v. Mumin* (2023) 15 Cal.5th 176, 202 ["'it is the exclusive province of the trial judge [in a court trial] … to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] … '[I]t may be confidently declared that, founded upon the evidence, the [fact finder] not only is authorized to make any logical and reasonable deduction, but also [the fact finder] is the exclusive judge of the weight and value of the inference that may be drawn by it'"].) And, in general, we review the court's factual findings at a section 1172.6, subdivision (d)(3) hearing for substantial evidence. (See *People v. Henley* (2022) 85 Cal.App.5th 1003, 1017; *People v. Williams* (2020) 57 Cal.App.5th 652, 663.) Thus, we must determine whether substantial evidence supports the trial court's finding that the testimony did not establish Perry burned any floor mats.[7] And it is well-settled that "'[a] reviewing court neither reweighs

---

[7]In a footnote in his reply brief, defendant states, "If … the trial court merely weighed the effect or influence of the evidence of Josh Perry's destruction of evidence by comparison with the entire record, … then the … lower court's assessment of the effect of the Diane M[.] testimony is a finding of law (probative effect of evidence) based on documentary evidence, and is not subject to deferential review on appeal." He argues, if Diane's 2005 statement to Detective Moses was not eliminated as hearsay but instead weighed in the context of the trial transcripts, "the entire lower court judgment is based on the trial transcripts, which are fully reviewable by this Court on appeal," and subject to independent review.

Initially, "[w]e need not, and typically do not, address arguments raised for the first time in a reply brief." (*People v. Wilson* (2023) 14 Cal.5th 839, 872, fn. 11.) Nevertheless, it bears noting this is not a case where the court was only presented with documentary evidence. The court was also presented with live testimony by Diane M., Investigator Moses, and defendant

[the] evidence nor reevaluates a witness's credibility.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

Here, we conclude substantial evidence supports the court's factual finding that the testimony presented did not establish Joshua Perry burned any floor mats. Indeed, the evidence presented at the section 1172.6 hearing reflects Diane M. never told Detective Moses in her prior statement that she saw Perry burn the floor mats. And, at the evidentiary hearing, she expressly testified she did not see Perry do this. Rather, she testified her prior statement that Perry burned the floor mats was based upon a statement she heard from her now-deceased father. Thus, the court had evidence before it from which it could conclude Diane's prior statement was not based upon her personal knowledge. And, accordingly, it could reasonably conclude such evidence should not be given much, if any, weight and did not establish Perry burned any floor mats. (See

_____

and, therefore, had the ability to consider their credibility in person. Thus, we cannot conclude this case is akin to a cold record. Additionally, multiple courts have rejected the argument that a trial court's findings at a section 1172.6 evidentiary hearing, when based on a cold record, should be reviewed independently. (See *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109–1110; *People v. Oliver* (2023) 90 Cal.App.5th 466, 479–480; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591; *People v. Clements* (2022) 75 Cal.App.5th 276, 283, 302.) These courts have instead concluded the question of whether a defendant is eligible or ineligible for resentencing is predominantly a factual question reviewable for substantial evidence. (See *Werntz*, *supra*, at p. 1109 ["the questions we face on a review from a court's denial of a section 1172.6 motion are primarily factual" and "the factors that persuaded the court in [*People v.*] *Vivar* [(2021) 11 Cal.5th 510] to apply independent review are not at play here"]; *Oliver*, *supra*, at p. 480 [concluding "[w]hether Oliver was a major participant in the underlying felonies who acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence"]; *Sifuentes*, *supra*, at pp. 232–233 [rejecting application of the independent standard of review and concluding whether petitioner knew or reasonably should have known the victim was a police officer was predominantly a factual question reviewable for substantial evidence under the resentencing statute]; *Mitchell*, *supra*, at pp. 590–591 [concluding "[s]ubstantial evidence support[ed] the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life"]; *Clements*, *supra*, at p. 283 [concluding "the trial judge sits as a fact finder at a hearing under section [1172.6], subdivision (d) and that substantial evidence support[ed] the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder"].)

*People v. Bodkin* (1961) 196 Cal.App.2d 412, 420 [where hearsay evidence is received, it "is to be considered and weighed with all the other evidence and given such credence and weight as the trier of fact deems it entitled to have"].) And there was substantial evidence to support the trial court's finding that such an inference was not warranted.[8]

Accordingly, we reject defendant's first contention.

## IV. Sufficient Evidence Supports the Trial Court's Finding Defendant Was the Actual Killer

Defendant next challenges the court's findings that he is ineligible for relief. First, we reject defendant's contention the evidence was insufficient to support the trial court's finding he was the actual killer.

### A. Applicable Law

"[T]he term 'actual killer' is meant to distinguish the person who actually caused the victim's death, including in circumstances where two or more persons participated in the felony." (*People v. Garcia* (2022) 82 Cal.App.5th 956, 968.) Stated differently, the term is used to describe a person who "personally killed" the victim. (*People v. Jennings* (1988) 46 Cal.3d 963, 979; accord, *People v. Vang* (2022) 82 Cal.App.5th 64, 88 [the term "actual killer" is limited to "the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act"].) Thus, "the meaning of 'actual killer' … is literal. The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or" other means. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 152.)

---

[8]Defendant further asserts the court erred in excluding such evidence because reliable hearsay is properly considered in the context of a section 1172.6 hearing, citing *People v. Del Rio* (2023) 94 Cal.App.5th 47, 56–57. Because, as discussed, we cannot conclude the court excluded such evidence, we need not address this argument.

**B.    Analysis**

Defendant contends "[t]here is insufficient basis for the trial court's conclusion that [he] was the perpetrator of this murder." Rather, he argues, "Perry was the murderer, and the prosecution did not demonstrate the contrary beyond a reasonable doubt." He asserts "it was an abuse of discretion to deny the Petition, and the order of denial must be reversed." We disagree and conclude substantial evidence supports the court's finding defendant was the actual killer.

Here, the evidence presented at trial and admitted at the evidentiary hearing supported conclusions that defendant had been planning a "comeup" against Johannes; he was present at the scene of the killing; he admitted to Demore he beat Johannes right after the incident; he was in possession of Johannes's property on the day of the murder; he attempted to get rid of some of the property and his clothing immediately after the killing; and he fled after the homicide. Multiple witnesses testified defendant's hand was swollen after he left Johannes's house and that he stated he beat up someone. Indeed, Demore testified defendant told her he put something in Johannes's Kool-Aid to try to make him go to sleep. And, when Demore went to the vehicle and left defendant and Johannes in the house, she "heard what sounded like a wrestling match going on," "banging, like somebody was wrestling, and that went on for a couple minutes and then it went quiet and a couple minutes later, [defendant] ran down the driveway and he had a [blue] pillowcase over his shoulder and it had a bunch of stuff in it." She testified defendant "was pretty shook up," and he told her Johannes came downstairs, held the cane up, and swung at him and then they started wrestling. She also testified defendant said he and Johannes ended up in the bathroom and defendant hit Johannes "several times over the head with the cane" and "he stomped on his chest and then he beat him up with his fists." Defendant stated Johannes "wouldn't knock out when he was hitting him." The forensic evidence established that Johannes's cane had defendant's fingerprints on it and defendant's partial handprint was also found near the stove, which there was

33.

evidence Demore had just wiped down before she left. The pathologist opined the cause of death was "[s]hock and hemorrhage and asphyxia due to multiple blunt force injuries; in other words, he went into shock from hemorrhage, but he also had some component of asphyxia from the lung problem, chest problem and the neck injury." On this record, we conclude there is substantial evidence defendant personally committed the act or acts directly causing the victim's death.

Contrary to defendant's suggestion, the prosecution was not required to prove he had the intent to kill for the court to conclude beyond a reasonable doubt that he was the "actual killer" such that he could be convicted of felony murder on that basis. (See *People v. Garcia*, *supra*, 82 Cal.App.5th at p. 967 ["As amended by Senate Bill No. 1437, the text of section 189 provides no additional or heightened mental state requirement for the 'actual killer' prosecuted under a felony-murder theory; it requires only that '[t]he person was the actual killer.' (§ 189, subd. (e)(1).)"]; *People v. Vang*, *supra*, 82 Cal.App.5th at p. 88 ["Generally, the 'actual killer' need not have acted with any intent to kill"]; see also *People v. Thompson* (1990) 50 Cal.3d 134, 187 ["As to the actual killer in a felony murder, intent to kill is not legally required as a prerequisite to imposition of the death penalty"]; accord, CALCRIM No. 540A ["A person [who was the actual killer] may be guilty of felony murder even if the killing was unintentional, accidental, or negligent"].)

Defendant argues at length that there was evidence Perry was the perpetrator of the murder. But even if the evidence presented could be reconciled with a contrary result, this is not a basis for reversal. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293 ["If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"]; *People v. Valdez* (2004) 32 Cal.4th 73, 104 ["'"'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding

34.

does not warrant a reversal of the judgment'"'"'"].)  As discussed, "'[a] reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'"  (*People v. D'Arcy*, *supra*, at p. 293.)  And here, because we find substantial evidence supports the trial court's conclusion defendant was the actual killer, we reject defendant's contention the court erred in denying his petition for resentencing.

## V.     Substantial Evidence Supports Finding Defendant Was a Major Participant in the Underlying Felony Who Acted With Reckless Indifference to Human Life

Next, we conclude substantial evidence also supports the trial court's finding that defendant was a major participant in the underlying felony who acted with reckless indifference to human life when he participated in the robbery/burglary.

### A.     Applicable Law

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole….  For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery."  (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674.)  By incorporating this requirement, section 190.2 codified the holding of *Tison v. Arizona* (1987) 481 U.S. 137, bringing California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; accord, *People v. Clark* (2016) 63 Cal.4th 522, 609; *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004.)  Section 190.2 thereby requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime."  (*People v. Banks* (2015) 61 Cal.4th 788, 801.)

In *Enmund v. Florida* (1982) 458 U.S. 782 the United States Supreme Court held the death penalty could not constitutionally be imposed on a robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state. (*Id.* at pp. 798, 801; *In re Scoggins*, *supra*, 9 Cal.5th at p. 675.) Distinguishing *Enmund*, *Tison* held the death penalty could be lawfully imposed on two defendants, brothers who helped their father and his cellmate—both convicted murderers—escape from prison. (*Tison v. Arizona*, *supra*, 481 U.S. at pp. 150–152.) The brothers locked up the prison guards and armed the two prisoners during the escape. (*Id.* at p. 139.) A few days later, the group's vehicle got a flat tire. (*Ibid.*) One of the brothers flagged down a passing car for help while the other four armed themselves and lay in wait by the side of the road. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint the family of four in the car, robbed them, and drove them into the desert. (*Id.* at p. 140.) The sons stood by while the father and cellmate shot the victims repeatedly. (*Id.* at p. 141.) The perpetrators left the family—which included a toddler and a teenager—to die in the desert, and drove off in the family's car. (*Id.* at pp. 140–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Tison*, *supra*, at p. 152; see *id.* at pp. 157–158.)

*Enmund* and *Tison* helped define the constitutional limits for punishing accomplices to felony murder and establish a "'spectrum of culpability,'" with felony murderers who "'actually killed, attempted to kill, or intended to kill'" at one end, and minor actors who were not present on the scene and neither intended to kill nor had any culpable mental state at the other end. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675; accord, *People v. Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than … Enmund's, lies the constitutional minimum" required for the imposition

36.

of a sentence of death or life without the possibility of parole.  (*Banks*, at p. 802.)  *Tison* and *Enmund* did not establish a ceiling or a floor for determining when an aider and abettor is eligible for such a sentence, however.  (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.)  The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply.  The question is one of degree.  (*Miller*, *supra*, at p. 974, fn. 4; *Bennett*, *supra*, at p. 1014, fn. 4.)

In *Banks*, our state Supreme Court clarified the  "major participant" and "reckless indifference to human life" requirements of section 190.2, subdivision (d).  *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*People v. Banks*, *supra*, 61 Cal.4th at p. 794.)  The court listed various factors that should be considered in making that determination:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid.*)

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant who acted with reckless indifference. (*People v. Banks*, *supra*, 61 Cal.4th at pp. 804–805, 808, 811.)  No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he

had any role in instigating the shooting, or could have prevented it.  (*Id.* at p. 805.)  He was "no more than a getaway driver," like Enmund.  (*Ibid.*)

The following year, in *Clark*, the court addressed the "reckless indifference" determination.  (*People v. Clark*, *supra*, 63 Cal.4th at pp. 614–623.)  Reckless indifference to human life may be "'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'  [Citation.]"  (*Id.* at p. 616, quoting *Tison v. Arizona*, *supra*, 481 U.S. at p. 157.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*People v. Clark*, *supra*, at p. 617.)  Reckless indifference to human life has both a subjective and an objective component.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)  Subjectively, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'"  (*Ibid.*, quoting *People v. Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.)  Objectively, "'"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'"  (*Scoggins*, *supra*, at p. 677; accord, *Clark*, at p. 617.)

*Clark*, like *Banks*, listed various factors to be considered when determining whether a defendant acted with reckless indifference:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In*

38.

*re Scoggins*, *supra*, 9 Cal.5th at p. 677, citing *People v. Clark*, *supra*, 63 Cal.4th at pp. 618–623 [listing factors].)

Based on these factors, *Clark* concluded the defendant there did not act with reckless indifference to human life. (*People v. Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind who planned and organized" a computer store robbery and waited across from the store's parking lot when the fatal shooting occurred. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed, when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 620–622.) However, during the attempted robbery the mother of one of the employees—who had come to pick him up from work—entered the store, surprising the robbers, and the defendant's accomplice shot her. (*Id.* at p. 537.) As police cars arrived, the defendant fled the scene, leaving the shooter behind. (*Ibid.*) *Clark* concluded the defendant—who was not armed, was not physically present in the store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and the use of an unloaded gun—did not act with reckless indifference to human life. (*Id.* at pp. 611, 618–623; *In re Scoggins*, *supra*, 9 Cal.5th at p. 676.)

Our Supreme Court considered the reckless indifference inquiry in *In re Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery in which one of his accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at pp. 671–672.) There, the defendant was swindled by the victim in the purchase of three television sets. (*Id.* at p. 671.) In response, the defendant recruited two close friends to ambush the victim, "'beat the shit'" out of him, and get the defendant's money back while the defendant waited at a nearby gas station. (*Id.* at pp. 671, 678.) When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) In

concluding the evidence was insufficient to establish the defendant acted with reckless indifference, the *Scoggins* court considered that he was not present at the scene of the murder, he was not in a position to restrain the shooter, he did not know a gun would be used, he attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and he acted ambiguously after the shooting. (*Id.* at pp. 677–683.)

After the passage of Senate Bill 1437, section 189, subdivision (e)(3) now provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Because the factors articulated by the California Supreme Court in *Banks*, *Clark*, and *Scoggins* construe the language in section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), these factors apply when determining a defendant's eligibility for relief under section 1172.6 as a person convicted of felony murder. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 561 ["the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter"]; see generally *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419 ["[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes"].) Thus, we look to these factors in reviewing for substantial evidence a court's finding that a defendant was a major participant who acted with reckless indifference to human life.

B.     Analysis

Defendant argues there was insufficient evidence he acted with reckless indifference to human life. In support, he contends: "If the jury believed that [defendant] left the house while Johannes was still unharmed, as he claimed, passing Josh Perry on

the way out, [defendant] would have been nevertheless subject to conviction for burglary felony murder. If that is the basis for the murder conviction (and the prosecution has not proven otherwise beyond a reasonable doubt), then [defendant] is eligible for relief under section 1172.6, and the judgment must be reversed."

Considering the way defendant frames his argument, we must reiterate that we review the denial of defendant's "section 1172.6 petition, following an evidentiary hearing, for substantial evidence." (*People v. Emanuel* (2025) 17 Cal.5th 867, 885.) "Under this standard, 'we review the record """in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact"""' could find beyond a reasonable doubt that [defendant] acted with reckless indifference." (*Ibid.*) With these principles in mind, we also conclude the trial court's finding defendant was a major participant in the underlying felony who acted with reckless indifference to human life is supported by substantial evidence in the record.

While defendant does not expressly challenge the court's finding he was a major participant in the underlying felony, "factors demonstrating [defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference." (*In re Loza*, *supra*, 10 Cal.App.5th at p. 52.) Thus, we begin by considering the evidence that defendant was a major participant in the robbery/burglary, which is relevant to our inquiry into whether the evidence sufficiently established defendant acted with reckless indifference to human life. We have previously quoted the applicable factors *ante*, and do not repeat them here.

Here, there is substantial evidence defendant was not only involved in the planning of the robbery/burglary of Johannes, who defendant described as "somewhat disabled," there was evidence defendant was the instigator of the plan. There was evidence defendant started planning it months before it occurred, he identified Johannes as the target based on his belief Johannes had money, and he sought help from multiple

41.

people he knew. There was also evidence that on the day of the murder, defendant put something in Johannes's drink, with knowledge of Johannes's existing health issues, to put him to sleep. And by his own admission, defendant took Johannes's property. Additionally, substantial evidence supports a conclusion defendant was able to facilitate or prevent the actual murder as it was undisputed defendant was present when the beating of Johannes took place. Defendant was aware of Johannes's health conditions and that Johannes was on methamphetamine such that defendant's own actions or inaction could be deemed to have played a role in Johannes's death. Instead of rendering aid, defendant testified he grabbed a pillowcase of Johannes's property and fled after witnessing Perry brutally beat Johannes. We find this record sufficiently establishes defendant acted as a major participant in the underlying felony.

We next turn to whether there is substantial evidence in the record to support the trial court's conclusion defendant acted with reckless indifference to human life. We find there is. The circumstances of the offense paired with defendant's conduct provide substantial evidence to support the trial court's conclusion defendant acted with reckless indifference to human life.

As discussed, there is evidence defendant initiated the planning of the robbery/burglary and he targeted Johannes as the victim despite knowing Johannes was "frail" and had multiple health issues. There was evidence Perry expressed interest in defendant's idea, and defendant told Perry that Perry would know when defendant was at Johannes's residence because defendant's truck would be parked outside.

With regard to the first *Clark* factor, which relates to defendant's use or awareness of the presence of weapons, even if defendant's testimony were to be believed that Perry committed the lethal blows, it is undisputed defendant was present at the scene of the crime and his fingerprints were found on Johannes's cane, which a reasonable fact finder could conclude was used as a weapon against Johannes. Thus, there was substantial

42.

evidence from which a reasonable fact finder could conclude that defendant used a weapon against Johannes.

As to the duration of the killing, while the duration of violent conduct against Johannes is not clear, the evidence at trial reflects defendant and Demore were with Johannes for hours before Johannes was killed. During that time, defendant, Demore, and Johannes consumed methamphetamine and there was evidence defendant put something in Johannes's Kool-Aid to try to put Johannes to sleep. Additionally, by his own admission, defendant got in an argument with Johannes and took Johannes's property before any alleged involvement by Perry. Regarding the period of the violent confrontation, there was evidence Johannes was hit and brutally stomped on. Defendant testified the violent interaction began upstairs before moving downstairs. There was also evidence defendant told Demore that Johannes would not "knock out," from which a reasonable fact finder could conclude the violent struggle was not brief.

Next, we consider any efforts defendant took to minimize the risk of violence in the commission of the felony and his opportunity to restrain his confederate and/or aid Johannes. We conclude a reasonable fact finder could find defendant did not take any efforts to minimize the risk of violence or restrain Perry nor render aid to Johannes. There was evidence defendant made multiple efforts to involve others in the crime— planned to occur at Johannes's home, which was secluded and difficult to access—while Johannes was present. Additionally, defendant knew Johannes lived alone, had physical health conditions, had taken methamphetamine on the day of the crime, and owned a gun. Given these circumstances, a reasonable fact finder could infer defendant could have expected violence would be necessary to carry out the robbery/burglary that he instigated. While there was evidence defendant attempted to put Johannes to sleep while at the house, there was evidence defendant did so by putting an unknown substance in Johannes's Kool-Aid. Demore testified she saw a bottle of cleaner open, from which a reasonable inference could be drawn that defendant put chemicals in Johannes's Kool-

43.

Aid that could have by themselves hurt Johannes who was "fragile." Moreover, defendant knew Johannes did not in fact go to sleep. To the extent Perry could be deemed to have committed the fatal blow(s) against Johannes, defendant testified he was present during the beating and he saw Perry hit Johannes, push him down the stairs, hit Johannes with a cane, and stomp on him all over. While defendant asserts that he threw a piece of kindling at Perry when Perry was at the bottom of the stairs, the physical evidence at the scene did not corroborate this. Rather, there was evidence from which a reasonable fact finder could conclude defendant made no effort to minimize the risk of additional violence and he did not attempt to restrain Perry to the extent he was involved and attacked Johannes. Furthermore, there was evidence defendant made no attempt to render aid to Johannes; rather, by his own admissions, defendant took property from the scene and fled, leaving Johannes in his secluded house after being brutally beaten.

This record sufficiently supports the trial court's conclusion defendant acted with reckless indifference to human life; that is, defendant was "aware of and willingly involved in the violent manner in which the particular offense [was] committed." (*People v. Banks*, *supra*, 61 Cal.4th at p. 801.) This was not a situation where defendant was not present during the killing or took steps to minimize the risk of violence. Rather, viewing the totality of the evidence in the light most favorable to the trial court's judgment, we conclude evidence of the specific circumstances of the offense paired with defendant's conduct—including evidence he initiated the planning of the burglary of Johannes's house while Johannes was present knowing of Johannes's physical condition; he sought additional individuals to participate in the burglary; he attempted to spike Johannes's drink in the time leading up to the burglary; and he continued to engage in the burglary by taking items from the scene and fleeing after seeing the victim be brutally beaten instead of rendering aid—provide substantial evidence to support the trial court's conclusion defendant acted with reckless indifference to human life. Said differently, we find sufficient evidence supports the trial court's conclusion defendant was "aware of and

44.

willingly involved in the violent manner in which the particular offense [was] committed." (*Banks*, *supra*, at p. 801.) Accordingly, the record sufficiently supports the trial court's conclusion defendant acted with reckless indifference to human life. Nor can we conclude that "'"upon no hypothesis whatever is there sufficient substantial evidence to support"'" the court's finding. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Thus, we also affirm the trial court's order on this basis.

## VI.    Court Did Not Err With Regard to Consideration of Defendant's "Youth"

Finally, defendant contends his youth should have been considered at the section 1172.6 evidentiary hearing because it was relevant to his mental state for murder, citing *People v Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*). The People contend defendant's age was irrelevant to the trial court's finding defendant was the actual killer, and it does not negate the trial court's alternative finding defendant acted with reckless indifference to human life. We agree with the People and reject defendant's contention the trial court prejudicially erred in failing to consider his youth at the time of the offense in rendering its findings.

In *Pittman*, the defendant filed a petition for recall and resentencing pursuant to section 1172.6. (*Pittman*, *supra*, 96 Cal.App.5th at p. 411.) The trial court issued an order to show cause and, after holding an evidentiary hearing, denied the petition. (*Id.* at pp. 411–412.) The trial court found the defendant "'acted as a principal who along with co-defendant Harvest personally killed [the victim] while acting with express or implied malice. Alternatively, the court [found] that … [the defendant] acted with malice aforethought as an aider and abettor of a principal (Harvest) who killed [the victim].'" (*Id.* at p. 412.) The *Pittman* court concluded the defendant's youth—he was 21 at the time of the crime—was "a relevant factor in assessing whether [the defendant] formed the requisite mental state for conviction, which the trial court did not consider." (*Id.* at p. 404; see *id.* at p. 418.) The court found the error was not harmless, that is, there was a

reasonable possibility the failure to consider the defendant's youth impacted the trial court's decision. (*Id*. at p. 418.) In so concluding, the *Pittman* court noted the defendant committed the crime with peers who were 16 and 17 years old and "[i]nferences of immaturity and peer pressure may be drawn from those facts." (*Ibid*.) Additionally, "the trial evidence indicate[d] that [the defendant] and his peers acted impulsively and under the influence of 'transient rashness.'" (*Ibid*.) The selection of chisels as weapons appeared to be "spontaneous." (*Ibid*.) And the "motivation for the crime was the happenstance that … [the defendant] noticed [the victim] 'shooting up dope with a prostitute in his truck.'" (*Ibid*.) Given these circumstances, the *Pittman* court found "youth was a factor for the court to consider" at the resentencing hearing and remand was "appropriate for the court to consider how, if at all, [the defendant's] youth impacted his ability to form the requisite mental state for second degree murder." (*Id*. at 418; see *id*. at p. 404.)

As the People contend, the trial court here found defendant was ineligible for relief because he was the actual killer, a finding supported by substantial evidence. And as discussed *ante*, "section 189 provides no additional or heightened mental state requirement for the 'actual killer' prosecuted under a felony-murder theory; it requires only that '[t]he person was the actual killer.' (§ 189, subd. (e)(1).)" (*People v. Garcia*, *supra*, 82 Cal.App.5th at p. 967; accord, *People v. Vang*, *supra*, 82 Cal.App.5th at p. 88 ["Generally, the 'actual killer' need not have acted with any intent to kill"]; see *People v. Thompson*, *supra*, 50 Cal.3d at p. 187 ["As to the actual killer in a felony murder, intent to kill is not legally required as a prerequisite to imposition of the death penalty"].) Thus, defendant's youth at the time of the offense was not relevant to the court's finding defendant is ineligible for relief on the grounds he was the actual killer. Accordingly, we cannot conclude defendant was prejudiced by any alleged failure by the court to consider his youth at the time of the commission of the crime during the evidentiary hearing.

Nevertheless, we also cannot conclude the court prejudicially erred in failing to consider defendant's youth at the time of the crime in considering whether defendant acted with reckless indifference to human life. We generally presume the court was aware of and followed the applicable law. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) And here, even if the court did not expressly state it considered defendant's youth in rendering its initial findings, thereafter defendant raised his youth in response to the court's ruling after which the court reiterated its finding that defendant was ineligible for relief.[9]

Furthermore, unlike in *Pittman*, the facts of the offense here do not suggest defendant "acted impulsively," that the crime was "spontaneous," and/or that it occurred as a result of "happenstance." (Cf. *Pittman*, *supra*, 96 Cal.App.5th at p. 418.) The evidence also does not suggest the crime was motivated by "peer pressure." (See *People v. Oliver*, *supra*, 90 Cal.App.5th at p. 489.) Rather, as discussed, the evidence supported conclusions that defendant began planning the burglary/robbery months before it occurred based on his motivation to "come up" with money; he initiated the planning and sought additional participants; he specifically targeted Johannes after going to Johannes's house on multiple occasions; and he encouraged others to participate with him. In addition, defendant was 23 years old at the time of the commission of the offense. (*People v. Oliver*, *supra*, at p. 489 [noting the defendant was 23 at the time of the crime and "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26"].) And, notably, defendant "has failed to present on appeal or in the court below any specific support for the proposition that his level of maturity somehow lessened his culpability for this murder." (*Oliver*, at p. 490.)

---

[9]The evidentiary hearing at issue took place in September 2023. And "[t]he relevant appellate cases" *Pittman* cites in support of its conclusion "that youth is a relevant factor bearing on mental state in section 1172.6 petitions" were all decided well before the evidentiary hearing in this matter. (See *Pittman*, *supra*, 96 Cal.App.5th at p. 416.)

For these reasons, we cannot conclude it is reasonably probable that defendant would have obtained a more favorable result at the evidentiary hearing if the court had expressly considered his youth at the time of the offense in rendering its findings.  Thus, the court did not prejudicially err in this regard.

## DISPOSITION

The court's order denying defendant's section 1172.6 petition for resentencing is affirmed.


                                            PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


DE SANTOS, J.